256 N.J. Super. 524 (1991)
607 A.2d 696
VERONICA MCMAHON, PLAINTIFF,
v.
JOHN J. MCMAHON, III, DEFENDANT.
Superior Court of New Jersey, Chancery Division Family Part, Essex County.
Decided September 27, 1991.
*525 John E. Selser for plaintiff.
Tobie G. Meisel for defendant (Cole, Schotz, Bernstein, Meisel & Forman).
*526 JOHN J. HARPER, J.S.C.
In this matter, Veronica McMahon, now Veronica Azzara, plaintiff, seeks permission from this court to relocate from New Jersey to Missoula, Montana, taking with her Katherine McMahon, age 8 years and Elizabeth McMahon who is nearly 7 years old. These two children were born of plaintiff's marriage to John J. McMahon, III, the defendant herein which took place on April 18, 1980. In accordance with the Judgment of Divorce with property settlement agreement attached, which was marked into evidence in this proceeding as P-1, the parties share physical custody of these children as follows:
(1) The Parties will share physical custody of the two children of the marriage as follows:
The children shall reside with the Wife
(2) The Husband shall have physical custody on the following:
a) Alternate weekends commencing Friday at the end of the Husband's workday and continuing until Sunday evening, the children to be returned to the Wife not later than 7:30 PM if the next day is a school day and 8:00 PM if it is not.
b) On alternate single day school holidays and alternate religious holidays  Easter, Thanksgiving, Christmas Eve and Christmas Day and New Years Day.
c) Two days of visitation per week commencing at 5:30 PM and returning them to the Wife not later than 7:30 PM of the same evening, unless the next day is not a school day in which event they shall be returned not later than 8:00 PM. The parties agree that as the children become older, they will negotiate with respect to the hour of returning the children to the Wife.
d) The parties shall evenly split physical custody during Christmas vacation.
e) The parties shall share alternatively the Thanksgiving vacation from Thursday through Sunday, each parent to have visitation for the four days with the children.
f) The Husband shall have visitation with the children on Father's Day and Husband's birthday.
g) The parties shall mutually share the children's birthdays.
h) With respect to the summer vacation from school of the children for the first three years following this Agreement until the summer of 1991 the Husband shall have two weeks of visitation during the summer vacation with the children, not necessarily consecutive. Thereafter, the Husband shall have three weeks of visitation with the children during the summer vacation from school, not necessarily consecutive.
Further P-1 at paragraph 3 provides that: "The parties shall have joint custody with respect to decisions of medical, dental, *527 educational and religious matters." Paragraph 4 specifies: "The Husband and Wife at all times shall inform each other with respect to the residence of the children and the residence of each other and any changes of residence of each other."
Further, the Judgment of Divorce sets the level of child support at $350.00 per child per month upon the plaintiff vacating the marital home. Parenthetically, it should be noted that the defendant has satisfied his alimony obligation to plaintiff by a modest cash payment. The defendant purchased the plaintiff's interest in the marital home and intended to remain there as permitted pursuant to paragraph 9 of P-1. He remains living there today at 53 Clark Avenue, Bloomfield, Essex County, New Jersey. Plaintiff, on the other hand, currently resides at 291 Park Avenue, Building 2-5B, Nutley, Essex County, New Jersey in a two bedroom apartment with the children.
The Judgment of Divorce permits the defendant husband to take both children as tax exemptions until the plaintiff wife returns to work at which time the parties will each take one child as a tax exemption. The Judgment of Divorce requires the defendant, at his expense, to provide life insurance on himself in the amount of $25,000 running to the benefit of the children as irrevocable beneficiaries. P-1 also specifies that the defendant will supply health insurance coverage at his own cost and pay 100% of the unreimbursed health care expenses until the plaintiff is employed at which time the costs will be shared equally by the parties.
Against this legal framework constructed by the parties in their property settlement agreement attached to their Judgment of Divorce granted by the Honorable Herbert S. Glickman, J.S.C. on August 7, 1987, plaintiff brings her application for removal of Katherine and Elizabeth as principal custodian of these children. Defendant, on the other hand, has filed a cross motion seeking to expand his weekly contact with the children to overnight visits.
*528 Plaintiff's application must be determined in a plenary hearing in accordance with N.J.S.A. 9:2-2 which provides in pertinent part: "When the Superior Court has jurisdiction over the custody and maintenance of the minor children of parents divorced, separated or living separate, and such children are natives of this State, or have resided five years within its limits, they shall not be removed out of its jurisdiction against their own consent, if of suitable age to signify the same, nor while under that age without the consent of both parents, unless the court, upon cause shown, shall otherwise order." In this case, there is no question since these children are ages 8 and 7 years approximately that they are below a suitable age to signify their consent. See Judge Krafte's opinion in Kavrakis v. Kavrakis, 196 N.J. Super. 385, 391, 482 A.2d 958 (Ch.Div. 1984) where the court suggested age "14 years, as a chronological, prima facie starting point." Further, since defendant does not consent to removal of the children from this jurisdiction, the plaintiff must demonstrate "cause" in a plenary hearing sufficient for this court to permit her to relocate with the children from the jurisdiction. In assessing whether cause has been shown, this court is to be guided by decisions of our State Supreme Court, namely, Cooper v. Cooper, 99 N.J. 42, 491 A.2d 606 (1984) as modified by Holder v. Polanski, 111 N.J. 344, 544 A.2d 852 (1988) which sets forth the principles to be applied in a removal situation and case proceedings arising thereafter which indicate applications of these principles.
In accordance with the aforesaid approach, certain questions are to be asked and specific tests are to be met as suggested by the following questions:
(1) Does the custodial parent have a sincere, good faith reason for moving from this jurisdiction? If so, then
(2) Will the move be inimical to the best interests of the children?
(3) Will the move adversely affect the visitation rights of the non-custodial parent?
*529 (a) If the move substantially changes the visitation schedule, will the move have prospective advantages for the custodial parent and the children?
(b) Will the children suffer from the move?
(c) Is the custodial parent acting in good faith and not to frustrate the non-custodial parent's visitation rights?
(d) Can a reasonable visitation schedule be maintained for the non-custodial parent?
See discussion in Holder, supra, 111 N.J. at 352-53, 544 A.2d 852. The Supreme Court in Holder, speaking through Justice Pollock, stated: "In resolving the tension between a custodial parent's right to move and a non-custodial parents visitation rights, the beacon remains the best interests of the children." Ibid at 353-54, 544 A.2d 852.
In the instant case the plaintiff has testified that she has previously lived in Missoula, Montana for approximately one year at the house where she now intends to make her permanent residence. This house is owned by her present husband James Azzara who is a music teacher and a manager of rental properties in Missoula. Photographs of the house (P-2 in evidence) show that it is an attractive, Victorian type, older brick dwelling situated in a residential neighborhood. As explained by plaintiff, there is ample living space for plaintiff, James Azzara and the two children. According to the plaintiff and as shown in the information brochures and the booklets provided to the court on Missoula, Montana, (especially the Missoula Community Profile issued by the Missoula Economic Development Corporation as of June 1990), the city is located in western Montana at the junction of Interstate Highway 90 and U.S. Highways 10, 12 and 93 and Montana Highway 200. It has a land area of 12.9 square miles, an elevation of 3,205 feet above sea level, a population of 35,640 (as of 1988), a per capita income of $13,010 (as of 1988), an unemployment rate of 5.7% for Missoula County, and three major industries: (1) forest products; (2) the federal government's Northern Regional *530 Headquarters for the U.S. Forest Service is located there; and (3) the motor carrier (freight hauling) business. Tourism as well as the University of Montana play important roles in the economic and cultural life of this community. In addition, the city has two hospitals, is home for a number of businesses and financial institutions and has public transportation by bus as well as an airport located 5 miles west of the city of Missoula which is serviced regularly by several major domestic carriers including Continental Airlines, Delta Airlines and Northwest Airlines. The public school system of Missoula has been compared with the Nutley Public Schools by Dr. Leonard C. Jeffreys, Jr., a psychologist Court appointed in this case. Missoula has excellent public education according to Dr. Jeffreys. (See D-2 in evidence at page 7.)
From the information supplied, there is no doubt in this court's mind that the opportunity presented to the children to live and grow up in Missoula, Montana is significant and the benefits to be derived therefrom could be numerous, i.e., the advantages offered by growing up in the western part of Montana in an attractive residential neighborhood located in a thriving city nestled amongst picturesque mountains in what appears to be a healthy and safe environment. Contrasted with some parts of New Jersey and our State's much publicized problems of air pollution, toxic chemical contamination, medical waste, crowded highways, and heavily populated urban areas amongst others, one might say there is no question of the positive effect on the children of moving out west to Missoula, Montana, to the "Garden City" in the state known for the "Big Sky Country". But this assessment is based upon a superficial and most of all misplaced analysis which does not examine the issues by looking at them guided by "the beacon"  the best interests of these children.
This court does not doubt that plaintiff has good faith reasons for relocating to Missoula, Montana. She married James Azzara, a high school friend from New Jersey and has lived in Montana for one year in the same house she now wishes to *531 make her new home with Mr. Azzara and the children. She hopes to start a gourmet baskets business and feels confident she can do this or find other suitable employment. She is a former elementary school teacher and has worked for the Newark Museum. She appreciates music and other cultural events and activities, as does her new husband. He especially enjoys the outdoors and wants to have plaintiff and the children live at his home and to enjoy various activities with them. The City of Missoula has a good public education system and is home for the University of Montana. All told, the benefits of a new life for plaintiff and the children are evident. The plaintiff loves Mr. Azzara and wishes to bring her children to that part of the country where he now has roots and appears to be happiest  Montana. She wishes to begin a new life and establish a family there. Her motives are sincere and she is acting in good faith. The first prong of the Cooper/Holder test is satisfied.
Proceeding to the third prong of the test dealing with visitation, it is obvious, as outlined earlier in this opinion, that the move to Missoula, Montana will have prospective advantages to the custodial parent and the children. It appears a better quality of life awaits them in Montana. Opportunity exists for plaintiff for starting a business or finding employment. Mr. Azzara will supplement the family income as well.
The plaintiff is not trying to frustrate or thwart defendant's visitation rights by moving to Montana. She knew James Azzara before she met and married defendant, lived at Mr. Azzara's house in Missoula before she married defendant and only cut short her stay in Montana because family illness required her presence in New Jersey. After returning to New Jersey she met the defendant at I.T.T., fell in love and married him. Later the children were born and they remained living with both parents until the parties separated in February of 1989. The plaintiff moved to Nutley in a two bedroom apartment which is only twenty minutes to one-half hour by car from the marital home. The defendant has remained in the marital *532 home in Bloomfield. Based upon the sincere desire evidenced by plaintiff to co-parent with defendant and the fact of good cooperation between the parents on visitation up until the filing of the removal application by plaintiff, this court does not doubt plaintiff's sincerity or good faith. She does not seek to frustrate or thwart defendant's visitation rights.
There is no question that visitation will be substantially changed for defendant if the children go to Missoula, Montana. They will only be available to defendant during the summers, and during Christmas and Spring recess from school. (See P-4 in evidence, the School Calendar) Plaintiff suggests that she will chaperone the girls and pay for their trips to New Jersey as well as her own for the foreseeable future. Trips to and from New Jersey can be up to 9 1/2 hours in length depending upon the airlines and the route taken. Costs vary from a low of under $400 round trip per person to over $1200 depending upon the circumstances of the reservations and routing. Though the plaintiff intends that defendant have the children for substantial periods of time in the summer and at holiday time, the defendant is not allowed to routinely take 4 weeks vacation at one time under his employer's, I.T.T.'s policy. His vacation now consists of regularly taking not more than two weeks off at one time in the summer. Other vacation is taken at various times throughout the year. It appears that plaintiff's intentions may have difficulty being translated into reality.
The visitation schedule presented by the plaintiff at first blush appears reasonable (extended visits with defendant at little or no cost to him at various times of the year). The problems confronting plaintiff and her plans loom large, however: the substantial costs of travel to and from New Jersey for her and the girls, the significant length of travel time taken on each trip to cover two thousand plus miles, the rigors of traveling for long periods with small children, and the difficulty defendant would have in taking off extended periods of time to be with the children so he could have as much time with the *533 children as possible given his frequent and regular contact with the children now and his strong desire to co-parent following the divorce. This court seriously doubts if the good intentions of plaintiff can be realized. Further, plaintiff's plan for subsidizing the visitation appears costly and is predicated on her obtaining employment or starting a profitable business. What if she cannot start a profitable business or find a job in which she can make enough money to underwrite visitation costs as well as contribute meaningfully to her support and the support of the children? Defendant, given the expenses outlined in his case information statement of $3,012 per month including $700 in monthly child support with a $46,000 annual salary, cannot reasonably be expected to fund frequent trips for the girls to New Jersey or to take frequent trips to Montana. Will visitation be reduced? It appears likely unless there is a substantial commitment of funds to ensure it occurs regularly over the next few years which is a critical period in the children's development.
Besides the question of the reasonableness of visitation, the court must address whether the move will be harmful to the children. Will the move be in the best interests of the children? After considering the testimony of both parents, the opinions of David J. Gallina, M.D., psychiatrist and Leonard C. Jeffreys, Jr., Ed.D., psychologist, and after observing and interviewing the children, this court finds that the move to Missoula, Montana, will not be in the best interests of the children for several reasons:
(1) There is a strong bond between both parents and the children will be severely strained by the separation of the children and plaintiff from New Jersey.
(2) Both parents have cooperated with one another under their property settlement agreement and are successfully co-parenting these children. Close proximity of the parties and the children has facilitated this. As explained below the unique *534 relationship contemplated by the property settlement agreement will be changed by the relocation.
(3) The property settlement agreement contained in the Judgment of Divorce provides for the unusual arrangement of sharing physical custody with the defendant's physical custody being outlined in a way in which one would normally find a visitation schedule. The court finds that the property settlement agreement was only concluded after defendant insisted upon sharing physical custody of the children and plaintiff agreed. Under that agreement both parties share legal custody and are to cooperate in making major decisions affecting the health, education and welfare of these children. These facts, together with the frequent regular contact with the children that defendant is allowed under the property settlement agreement as set forth earlier in this opinion, and the regular and frequent contact defendant has had in fact with the children, make this truly a shared custody arrangement. This is a situation where a father has maintained frequent and regular contact with his children post divorce, has had lunch with them at school at various times, and has visited them when they were ill at plaintiff's apartment and he could not have them come to his house. In this case, defendant insisted on keeping the marital home to provide a sense of home and stability for the children when they are with him. Defendant shares birthdays with plaintiff (each has his/her own birthday observance for the children). Defendant takes the children to church every other weekend when he has them. Defendant continues to involve the children in family activities including regular visits to his parents and other relatives. Defendant attends parent/teacher conferences with the plaintiff for the welfare of the children. All of these activities and efforts suggest that defendant as well as plaintiff are responsible for the fact that these children are healthy and appear to have coped well when these parents separated and were divorced. To exclude defendant from his shared custody and to prevent the regular and frequent weekly contact between the children and their father will deprive these *535 children of the important benefits derived from the co-parenting efforts of these two parents, which efforts are fostered by the property settlement agreement, and will end the children's frequent visits to the former marital home. The testimony of Dr. Jeffreys supports these findings especially when the tender ages of these children are considered. This court is doubtful that frequent telephone calls or letters can substitute for the regular, frequent, personal contact with defendant and visits to the marital home. Children ages eight and seven years will be more seriously impacted by the separation under the facts presented in this case than older children of high school age who are seeking to assert their independence. If we had a father who was not as involved in parenting his children post divorce as Mr. McMahon, perhaps the fact of separation over two thousand miles would not have the impact that Dr. Jeffreys concludes in his testimony. However, such a case is not presented here.
(4) The children are involved not only with their parents under the shared custody arrangement, but with an extended family including grandparents. The McMahon grandparents as well as Mrs. Azzara's parents form an integral part of the extended family network that emotionally supports these children. Though Mrs. Azzara's parents will soon relocate to Florida, the McMahon grandparents intend to remain in New Jersey for the foreseeable future. Their involvement with the children as testified to by Mr. McMahon, Sr. is regular and appears important to the children. Grandparents' contributions to the welfare of grandchildren have been recognized and protected by the Legislature when it enacted N.J.S.A. 9:2-7.1 providing visitation rights to grandparents where parents are divorced. If the children were taken from New Jersey to Montana there would be little opportunity for the children to benefit from the special wisdom, love and companionship that only a grandparent can provide. The strong bond that exists with the grandparents would be jeopardized and the contributions of the grandparents would be severely limited.
*536 (5) The children have friends at both school in Nutley and at home in Nutley and in Bloomfield. Separation and relocation to a new state will most likely be harder for the children when their father, grandparents and other relatives and friends are not around to comfort and to interact with them.
In this case, as in the case of Winer v. Winer, 241 N.J. Super. 510, 575 A.2d 518 (App.Div. 1990), the childrens' best interest is closely related to the contact of the noncustodial parent with them. With children of tender years, there should be as much contact with the non-custodial parent as possible in order to preserve and foster the relationship between the noncustodial parent and the children. Ibid at 519, 575 A.2d 518 (citing a portion of the trial court's findings). This is especially true in a shared custody, co-parenting situation such as the instant case. Here defendant has shown that the substantial change in his visitation to be occasioned by the proposed relocation will prove harmful to the children. It will terminate the co-parenting, shared custodial arrangement that is intended and fostered by the property settlement agreement that has been agreed to and implemented by the parties. See Winer, supra and Zwernemann v. Kenny, 236 N.J. Super. 37, 563 A.2d 1158 (App.Div. 1988). Further, the suggested visitation for defendant will in fact change his relationship with the children from a custodial to a non-custodial one. The visitation offered cannot replace the current relationship that the children have with defendant or with plaintiff and defendant under the co-parenting arrangement. The close relationship between defendant and his children which is built upon the regular, frequent contact encouraged by the property settlement agreement cannot be fostered or preserved with the limited, occasional visitation proposed. See Zwernemann, supra, 236 N.J. Super. at 47, 563 A.2d 1158. The plaintiff's desires to preserve and foster the children's relationship with their father cannot overcome the harm which infrequent contact with the defendant and loss of the shared physical custody will visit upon them. Dr. Jeffreys' testimony supports these findings. Dr. Gallina's testimony, which finds *537 the children healthy and therefore better able to withstand the rigors of separation, is predicated only upon interviews of the children and plaintiff. He did not interview defendant or observe his interaction with the children. He cannot accurately assess the interaction and bonding between defendant and his children. Dr. Gallina's opinion, therefore, is of limited value to this court and is rejected as to his ultimate findings that the quality of the relationship with the father can be maintained while allowing the mother and children to move to Montana.
For the foregoing reasons I am constrained to deny plaintiff's application to relocate with the children to Missoula, Montana. This is not an easy decision to make. The court recognizes the consequences of its decision which include placing greater strain on the relationship between plaintiff and her new husband. However, plaintiff took a calculated risk and married a man in Montana before she secured approval for the relocation of the children to Montana, either from defendant or this court. Hopefully, she will be able to prevail upon Mr. Azzara to return to New Jersey for that appears to be a result that will be in her best interests and the best interests of these children under the unique circumstances of this case. Defendant's application for overnight visitation during the week will be denied. The current shared custody arrangement works well as the emotional and physical health of the children indicates. Overnight visitations during the week when school is in session will not promote the welfare of these children. Defendant's motion is, therefore denied. Ms. Meisel is to prepare an order incorporating and implementing the opinion of the court and to submit same pursuant to R. 4:42-1(c) to this court and her adversary, Mr. Selser.